**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

| | | |
|---|---|---|
| MISAEL CORDERO, | : | |
| Petitioner, | : | Civil Action No. 11-6114 (JLL) |
| v. | : | **OPINION** |
| GREG BARKOWSKI, et al., | : | |
| Respondents. | : | |

---

**APPEARANCES:**

Misael Cordero, *Pro Se*
#257533
New Jersey State Prison
P.O. Box 861
Trenton, NJ 08625

John Anderson
Essex County Prosecutor's Office
50 West Market Street
Newark, NJ 07601
Attorney for Respondents

**LINARES, District Judge**

Petitioner Misael Cordero submitted this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state court conviction, and Respondents submitted an answer to the petition (ECF No. 11), with the available state court record. Petitioner also filed a traverse to the answer (ECF No. 33). For the following reasons, the petition will be denied.

## BACKGROUND

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division ("Appellate Division"), in Petitioner's direct appeal.[1] See Respondents' Exhibit ("RE") 6.

>In late April or early May 1991, knowing that Elias Lopez was going to be returning from Puerto Rico with a large amount of cocaine, defendant and Santiago plotted to kill him and to steal the cocaine. Defendant and Santiago agreed that Santiago would kill Lopez in exchange for $20,000, which would be paid after the drugs were sold. On May 6, 1991, defendant and Santiago requested that Ruiz dig a hole in the dirt floor of the premises at 133 Parker Street, Newark, because they were "going to kill a guy." Ruiz agreed to dig the hole in exchange for $400.
>
>On May 7, 1991, Lopez arrived at defendant's apartment at 126 Parker Street, Newark, to take part in a scheduled drug sale. Inside defendant's apartment were defendant and his girlfriend, Cynthia Cordero. Santiago remained outside the apartment. Having observed Lopez arrive, Santiago went to the basement of 126 Parker Street, left a bag containing $2,000 in cash and newspapers cut to resemble stacks of cash on a table, and then joined the others upstairs in defendant's apartment. After defendant and Lopez "tested the coke," defendant and Santiago lured Lopez to the basement where Lopez anticipated to be paid. As Lopez proceeded into the basement, Santiago shot him in the back of the head, killing him. Defendant took the money, drugs, and Lopez's car keys. After the murder, defendant and Cynthia drove to her mother's house, where defendant showered and changed into new clothes purchased by Cynthia

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

2

> with money provided by defendant. Defendant, after having returned to 126 Parker Street with Jose Carrabollo, a friend, directed Carrabollo to clean the basement and wrap Lopez's body. Defendant and Santiago left the basement in order to dispose of Lopez's car by abandoning it in East Orange. Upon their return to the place of the murder, Santiago and Carrabollo placed Lopez's body into the trunk of defendant's car, drove it across the street to 133 Parker Street, and buried it in the basement grave. At a later date, cement was poured over the dirt floor in the basement at 133 Parker Street.
>
> In early 1999, when Cynthia Cordero was questioned as part of an investigation into an unrelated homicide, she provided a formal statement about Lopez's murder. In April 1999, the police executed search warrants at 126 and 133 Parker Street. Lopez's remains were recovered from the basement of 133 Parker Street, after which an autopsy confirmed the remains as being that of Lopez. The autopsy further confirmed the entrance and exit wounds in the back of the neck and forehead areas of Lopez's skull. The cause of death was determined to have been a gunshot wound to the head.

(RE 6 at pp. 1-2).

On May 13, 2002, after a jury trial, Petitioner was found guilty of first-degree murder, first-degree robbery, and other charges, contrary to New Jersey state law. Petitioner was sentenced on July 31, 2002 to a life sentence, with thirty years of parole ineligibility. Petitioner's sentence was upheld by the Appellate Division on August 15, 2006 (RE 6). On December 8, 2006, the New Jersey Supreme Court denied Petitioner's petition for certification (RE 7B).

Petitioner filed a motion for post-conviction relief ("PCR") in the trial court which was denied on August 26, 2008 (RE 11). The denial was upheld by the Appellate Division on October 1, 2010 (RE

16). On September 7, 2011, the New Jersey Supreme Court denied certification of Petitioner's petition for review (RE 20).

Petitioner filed this petition on or about October 17, 2011 (ECF No. 1). Respondents filed a Response and the relevant state court record on June 1, 2012 (ECF Nos. 11-32), to which Petitioner replied on August 20, 2012 (ECF No. 33).

In his petition before this Court, Petitioner seeks relief under 28 U.S.C. § 2254, arguing: (1) he was denied his right to effective assistance of counsel; (2) jury selection procedures resulted in a denial of Petitioner's constitutional rights; and (3) failure to correct the testimony of a state witness through the use of an interpreter violated Petitioner's constitutional right to a fair trial and due process (Pet., ¶ 13).

## **DISCUSSION**

### A.  **Section 2254 Cases**

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

With respect to any claim adjudicated on the merits in state

4

court proceedings, § 2254 further provides that the writ shall not issue unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."[1] *Id.* at 407-09. To be an

---

[1] "[A] state court adjudication fails the 'unreasonable application' test only if the state court identified the correct governing legal rule but unreasonably applied it to the particular case or if the state court either unreasonably extended a legal principle from Supreme Court precedent to a new context in which it should not apply or where it unreasonably refused to extend such a

5

"unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. *See id.* at 409. In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. *See Matteo v. Superintendent*, 171 F.3d 877, 890 (3d Cir. 1999); *see also Williams v. Ricci*, Civ. Action No. 09-1822 (DRD), 2012 WL 6554371, *14 (D.N.J. Dec. 14, 2012)(slip copy)(citing *Matteo*).

The deference required by § 2254(d) applies without regard to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." *Priester v. Vaughn*, 382 F.3d 394, 398 (3d Cir. 2004) (citing *Early v. Packer*, 537 U.S. 3 (2002); *Woodford v. Visciotti*, 537 U.S. 19 (2002)), *cert. denied*, 543 U.S. 1093 (2005).

Finally, a *pro se* pleading is held to less stringent standards than more formal pleadings drafted by lawyers. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A *pro se* habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. *See Rainey v.*

---

principle to a new context in which it should apply." *Greene v. Palakovich*, 606 F.3d 85 104 n.14 (3d Cir. 2010) (quoting *Fountain v. Kyler*, 420 F.3d 267, 273 (3d Cir. 2005)).

*Varner*, 603 F.3d 189, 198 (3d Cir. 2010); *Royce v. Hahn*, 151 F.3d 116, 118 (3d Cir. 1998); *Lewis v. Attorney General*, 878 F.2d 714, 721-22 (3d Cir. 1989).

B.  **Petitioner's Habeas Claims Will Be Denied.**

   1.  **Ineffective Assistance of Counsel**

Petitioner alleges that trial counsel was ineffective because of lack of preparation and investigation, failure to object to false testimony, failure to produce witnesses, and failure to consult with Petitioner (Pet., ¶ 13A).

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added).

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that his counsel's performance fell below an objective standard of reasonable professional assistance and that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984); *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 (3d Cir. 2012)(citing *Strickland*). A "reasonable probability" is "a probability sufficient

7

to undermine confidence in the outcome." *Id.* at 694. Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697.

An evidentiary hearing was held by the PCR court to assess Petitioner's ineffective assistance of counsel claims. Defendant's trial counsel, John McMahon, testified. He stated that he prepared a defense for Petitioner attacking the credibility of the co-defendants who were among the State's witnesses (RE 43).

After hearing the testimony, the PCR court issued a written opinion (RE 11). Citing *Strickland*, the PCR judge fully examined Petitioner's ineffective assistance of counsel claims and denied PCR finding:

> In sum, Cordero has failed to demonstrate by a preponderance of the evidence that had appellate and trial counsel raised the issues Cordero now asserts, the result would have been different. Among those issues were a jury instruction regarding the co-defendants' plea agreement, investigation into defenses and witnesses, failure to move for dismissal of the counts barred by the statute of limitations, and failure to make objections to allegedly

8

> inadmissible hearsay testimony and testimony about religious beliefs. Constitutionally defective representation that affected the outcome must be proved, and this Cordero has failed to do so [sic]. The record does not support a fair inference that either McMahon or Blum's performance was in any way inadequate or below a level of reasonable competence. The impact of Cordero's claims of error could not have had a prejudicial impact on the outcome of the trial or appeal.

(RE 11 at pp. 8, 21).

The Appellate Division also considered the counsel claims on appeal of the PCR decision and found:

> We have considered the arguments raised by defense counsel in Points I, II, and III of her brief and by defendant pro se in Points I and II of his supplemental brief in light of the record and applicable law. We are satisfied that none of them are of sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). On those issues, we affirm substantially for the reasons expressed by Judge Goldman in his thoughtful written decision of August 26, 2008.

(RE 16).

Petitioner's claim that he could have had a better plea deal had counsel reacted quicker to dismiss time barred charges does not satisfy the *Strickland* standard, as the time barred charges did not include the murder charge-- the charge to which Petitioner would have pled. Although Petitioner argues in his traverse that he was prejudiced because the time barred charges were not dismissed, (*see* Traverse, pp. 5-6), Petitioner has not demonstrated a reasonable probability that the outcome would have been different had the time

9

barred charges been dismissed, as found by the state court.

The Appellate Division found on direct appeal (RE 6 at pp. 26-33) that the trial court did not err in failing to discover and dismiss the time barred claims, and the PCR judge found no prejudice to satisfy the second prong of *Strickland* (RE 11). This Court agrees that Petitioner has not shown prejudice. Thus, as Petitioner fails to meet the prejudice prong of *Strickland*, performance does not have to be addressed. See *Strickland*, 466 U.S. at 697. This claim does not warrant habeas relief.

As to Petitioner's claim that counsel failed to prepare concerning an earlier investigation, the state courts accepted that counsel's use of the information concerning the earlier investigation was to attack the credibility of a State witness and constituted trial strategy (RE 44, 24T34-9 to 37-18). The state court's finding after the PCR hearing that counsel's use of the information was trial strategy was reasonable and therefore in accordance with *Strickland*.

Petitioner's claim that trial counsel failed to object to testimony concerning a witness' religious beliefs was addressed at the evidentiary hearing held by the state PCR court. Counsel testified that for strategic reasons he did not object to the testimony because he thought it helped Petitioner (RE 44, 43T26-21 to 25).

Likewise, counsel's failure to call a witness who was serving

10

a sentence for double homicide and allegedly knew nothing about the murder (RE 11 at p. 12, was deemed trial strategy. The witness had no personal knowledge of the murder. Everything he knew, which was not much, he learned from one of petitioner's co-defendants, Javier Santiago. He did not know the names of the alleged victim or the co-conspirator. He did not even know when the murder occurred. Moreover, when asked, he testified that he did not even believe Santiago's story was true. The PCR Court properly concluded that the proposed witness would not have been beneficial to the petitioner. (RE 11 at p. 12).

The record does not support Petitioner's claims that trial counsel failed to consult and prepare for trial. As noted by the PCR judge, "[t]he alleged failure of the trial counsel to investigate all claims on his client's behalf and to produce all witnesses is far from professional misconduct." (RE 11 at p. 13). The PCR court found:

> Many of the items complained of are minor details which would not be useful in a "cold case." Thus, it is reasonable to see why McMahon made the judgments that he did while proceeding with this case even though substantial portions of the trial file, including McMahon's trial notes were missing by the time of the PCR hearing. His judgments are afforded heavy deference. Furthermore, Cordero, himself, admits that he could only speculate as to the additional evidence that would have been produced had McMahon conducted the investigation he now complains did not occur.

(RE 11 p 13).

Here, a review of the record, including the transcripts of trial

11

and the state court decisions, which cited the proper United States Supreme Court precedent in *Strickland,* were neither contrary to, nor involved an unreasonable application of, clearly established federal law, nor were they based upon an unreasonable determination of the facts in light of the evidence presented. Thus, Petitioner is not entitled to relief on these claims.

### 2.   Claim Regarding Jury Selection

Petitioner alleges that the trial court erred in denying eight challenges for cause, "forcing defendant to spend peremptory challenges on those jurors." (Pet., ¶ 13B). The trial court also denied additional questioning to determine cause as to one juror, and erred in denying Petitioner's two motions to discharge the jury (Pet., ¶ 13B).

The Appellate Division explained these claims in detail in Petitioner's direct appeal:

> Defendant argues that the trial judge erred by failing to remove potential juror Bernard Carter for cause, thereby forcing defendant to expend his last peremptory challenge when removing the juror. Defendant contends that not only because of the result of trial judge's inaction, but also because of his failure to grant defendant's request for additional peremptory challenges, defendant "was unable to dismiss two other objectionable jurors, Audrey Reese and Diane Guarino, who ultimately sat on the jury."
>
> * * *
>
> At a sidebar conference during the voir dire, juror Carter advised that "although [he did not] think it would affect [his] judgment," his thirty-five year old daughter had been abducted and murdered by a serial killer in

12

>   Florida, fifteen months earlier. Having received that advice from Carter, the judge asked Carter whether he was "sure it wouldn't have any impact on [his] ability to be fair and impartial in this case[?]" to which Carter responded, "[n]o, sir, it wouldn't." Following up on that response, the judge asked "[w]ould having a case involving a homicide in any way cause you pain, discomfort sitting here listening to testimony perhaps about somebody being killed and-and be a painful experience for you in light of what-in light of your recent painful experience?" Carter answered: "At this moment, no, I don't think it would." Concerned about the impact that the Florida murder may have had upon Carter, defendant requested the trial judge to remove the juror for cause. The motion was denied. Questioned again the following day, Carter maintained that his daughter's homicide would not affect his ability to be fair and impartial. After defendant used peremptory challenges to excuse thirteen other potential jurors, defendant used his last peremptory challenge to excuse Carter. Defendant had requested additional peremptory challenges, but his request was denied.

*State v. Cordero*, 2006 WL 2346306 (N.J. App. Div. Aug. 15, 2006) at \*\* 3-4.

The Appellate Division examined the claim, first, noting that under the Sixth Amendment of the United States Constitution, "an impartial jury is a necessary condition to a fair trial." *Id.* at \*4 (citations omitted). The Court noted that under New Jersey law: "A trial judge's decision whether to remove a juror for cause will not be reversed unless there has been an abuse of discretion." *See id.* at \*5 (citation omitted).

For purposes of § 2254 review, the United States Supreme Court has held: "In reviewing claims of this type, the deference due to [trial] courts is at its pinnacle: 'A trial court's findings of juror

13

impartiality may be overturned only for manifest error.'" *Skilling v. United States*, 561 U.S. 358, ___ , 130 S. Ct. 2896, 2923 (2010) (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 428 (1991)).

The Appellate Division noted the trial judge's observations:

> On the following day, defendant raised the possibility that by allowing Carter to sit on the jury, there was a risk that Carter would sympathize with family members of the victim when they testify, and perhaps would be unable to adhere to his oath. Although this was a valid concern, Carter expressed an ability to keep his personal situation separate, and the judge was satisfied that he would. The judge, finding Carter to be "intelligent," "straightforward," "open," and "honest," stated: "I'm satisfied beyond any reasonable doubt that this juror's discussion of his ability to be fair and impartial is honest, truthful, and genuine in every respect."

The judge concluded by saying:

> Again, this is-this is really remote. And when I take its remoteness on one hand-take the remoteness of the criminal incident on the one hand and I take the similarity, I also take the fact the-the extenuation of the concept of victim and I take all those factors into consideration, the bottom line is-is that while I appreciate the language in ... [ Singletary ] and I agree that if I had any doubt at all, if I had any doubt of this juror's sense of fairness or mental integrity, if I had the slightest iota of doubt, if I was not convinced beyond a reasonable doubt that this juror could and would be fair, I would agree with you.
>
> But if I[am] honestly convinced and genuinely convinced that there is no basis and that I[am] convinced beyond a reasonable doubt based upon my evaluation of this juror's responses that he can and would and will be fair,

14

> I can[not] in good conscience excuse him for cause.
>
> Jurors have a constitutional right as well to be jurors and not to be excused for [any] reason at all. And I [am] satisfied this juror can and should be a fair juror.
>
> We are satisfied that the trial judge carefully considered Carter's ability to serve as a juror, and no abuse of discretion existed in denying defendant's request that Carter be dismissed for cause.

*Cordero*, 2006 WL 2346306 at **5-6.

Here, as in *Skilling*, the trial judge "had looked [each of these jurors] in the eye and ... heard all [their answers and] found [their] assertions of impartiality credible." *Id.* at 2924 (citations and internal quotation marks omitted). Under these circumstances, the New Jersey courts' adjudication of Petitioner's inadequate voir dire claim was not contrary to, or an unreasonable application of, *Skilling* or other Supreme Court holdings. Petitioner is not entitled to relief on this claim.

### 3. **Interpreter Claim**

In Ground Three of his petition, Petitioner argues that a portion of a state witnesses' testimony was translated incorrectly, rendering the trial unfair. Specifically, after review of the videotaped testimony, "two Court appointed interpreters agreed that corrections were needed," however when it "came time to make such corrections,

15

the interpreters changed their minds and petitioner was denied the opportunity to explain the correct meaning of the testimony to the jury." (Pet., ¶ 13C).

The Appellate Division examined this claim on direct appeal and found it to be without merit to warrant discussion. *Cordero*, 2006 WL 2346306 (N.J. App. Div. Aug. 15, 2006).

The transcripts of the trial reveal that Petitioner disagreed with an interpretation that one of the courtroom interpreters stated during the trial, in particular, the difference between "he" was going to kill me versus "they" were going to kill me. (RE 31, 11T21-1 to 9). Petitioner argues that: "The incorrect translation accused petitioner of threatening three state witnesses . . . in order to keep them from talking. On the other hand, if the correction would have been made the defendant would not have been branded as one of the individuals who made the threats." (Pet., ¶ 13(C)).

The interpreter's supervisor explained at sidebar:

> THE INTERPRETER: The reason why I asked to speak to you for a moment outside the jury is because the topic of controversy last Thursday was whether it was *they were* going to kill me or *he was* going to kill me. Today Miss Marte [another interpreter] is confirming part of what I was convinced I heard last Thursday, that the part of the answer in question says he said that if I didn't say anything to anybody nothing was going to happen but if I talked, *they were* going to kill me and Samuel Soto and Nereida, his wife. So later in the question it does change to *they were* going to kill me.

(RE 31, 11T15-9 to 16-17)(emphasis added).

16

Defense counsel asked that Petitioner be permitted to interpret what he believed said, but the Court denied the request (RE 31, 11T17-20 to 23). The interpreter reviewed her interpretation and concluded that her initial interpretation was correct (RE 31, 11T18-4 to 14; 11T21-1 to 9).

Here, although Petitioner may disagree with the interpretation, he does not establish that his constitutional rights were violated by the examination of the interpretation, or that any wrongdoing occurred. Certainly, he has not established that the process in figuring out the interpretation compromised the fairness of his trial. Nor has Petitioner established that the trial court's actions were an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. *Cf. Kitchen v. Tucker*, No. \_\_\_\_ , 2012 WL 7051038 (N.D. Fla. Sept. 20, 2012) ("Petitioner has pointed to no Supreme Court precedent, in his state court pleadings or here, holding that a court-appointed interpreter's translation of witnesses' examination under the circumstances presented here violates a defendant's federal constitutional rights to due process and confrontation. The undersigned has not found any such precedent."); *see also Nguyen v. Tilton*, No. \_\_\_\_, 2009 WL 839278, *19 (N.D. Cal. Mar. 30, 2009) ("Petitioner . . . claims that denying the prosecution's witness an interpreter somehow violates the Petitioner's constitutional rights . . . . However, there is no

17

clearly established federal law extending any such right to witnesses.") As such, this claim does not warrant habeas relief.[2]

### C. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, no certificate of appealability shall issue.

---

[2] Respondents' Affirmative Defense that Petitioner's case is time-barred is denied, as the time that the PCR is pending is tolled for purposes of the time limitations on habeas relief. *See* 28 U.S.C. § 2244(d)(2).

18

## **CONCLUSION**

For the reasons set forth above, the petition and pending motion are denied. No certificate of appealability will issue.

An appropriate order follows.

_____
JOSE L. LINARES
United States District Judge

Dated: 2/26/14